1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

10  AUGUSTINE GOLAFALE,                  CASE NO. C14-1683JLR

11                  Plaintiff,           ORDER GRANTING
                                         DEFENDANT'S MOTION FOR
12        v.                             SUMMARY JUDGMENT

13  SWEDISH HEALTH SERVICES,

14                  Defendant.

15                          I.    INTRODUCTION

16       This matter comes before the court on Defendant Swedish Health Services, d/b/a

17  Swedish Medical Group's ("Swedish") motion for summary judgment.  (MSJ (Dkt.

18  # 18).)  Having considered the submissions of the parties,[1] the balance of the record, and

19

20  _____

    [1] Within two days of oral argument and several weeks after the briefing concluded on the
21  motion, both parties filed praecipes that purport to correct citations to the record in the original
    briefing and supplement the record itself.  (See Pr. to MSJ Resp. (Dkt. # 49); 2d Pr. to Watts
22  Decl. (Dkt. # 50); Pr. to 1st Dammel Decl. (Dkt. # 52).)  The court would ordinarily be
    disinclined to consider the untimely praecipes, which are to be filed "as promptly as possible."

the relevant law, and having heard oral argument on March 31, 2016, the court GRANTS

Swedish's motion for summary judgment and DISMISSES this case WITH PREJUDICE.

## II.   BACKGROUND

### A.   Mr. Golafale's Initial Employment With Swedish

This is a case involving alleged discrimination in employment by Swedish against

Mr. Golafale. (*See generally* Compl. (Dkt. # 1).)  Swedish hired Mr. Golafale in January

2011 to work as a refund specialist. (*See* 1st Dammel Decl. (Dkt. # 19) ¶ 2, Ex. A (Dkt.

# 19-1)[2] ("10/28/15 Golafale Dep.")[3] at 60:11-15, 78:4-5; *id.* ¶ 5, Ex. B ("Job Descr.") at

1-2.)  Among the "essential duties [and] responsibilities" of a refund specialist is

"[e]nsur[ing] patient satisfaction through timely and effective processing of refund

requests." (Job Descr. at 1.)  Prior to beginning work at Swedish, Mr. Golafale had held

numerous similar jobs in the greater Seattle area. (Golafale Decl. (Dkt. # 30) ¶ 5, Ex. A

---

Local Rules W.D. Wash. LCR 7(m) ("Parties are expected to file accurate, complete documents, and the failure to do so may result in the court's refusal to consider later filed corrections or additions to the record.").  However, at oral argument, both parties agreed that the court should consider the praecipes.  In the interest of ruling on the motion for summary judgment with a complete and accurate record, the court considers the parties' praecipes herein.

[2] The first Dammel declaration (Dkt. # 19) attaches Exhibits A through F (Dkt. # 19-1), G through T (Dkt. # 19-2), U through DD (Dkt. # 19-3), and EE through QQ (Dkt. # 19-4).  The second Dammel declaration (Dkt. # 41) attaches Exhibits A through H (Dkt. # 41-1).

[3] The parties have placed excerpts from several depositions on the record. (*See, e.g.*, Dkt. ## 19-1, 19-3, 19-4, 32-1, 32-2, 32-9, 32-18, 42-1.)  A few of these excerpts appear in part in multiple places in the record. (*See, e.g.*, 10/28/15 Golafale Dep. (Dkt. ## 19-1, 32-1).)  When first referencing the transcript of a particular deposition, the court indicates the docket number and the deponent.  However, in subsequent citations to that deposition transcript, the court does not indicate which of the multiple locations on the docket contains that particular segment of the relevant deposition.

1  at 1-3.)  Before being hired, Mr. Golafale passed an "interview test" tailored to the

2  position of refund specialist.  (*See id.* ¶ 6, Ex. B at 1-7.)

3          Mr. Golafale's performance review for 2011 describes an employee who was still

4  learning the job but fully met or exceeded expectations in all categories.  (Watts Decl.

5  (Dkt. # 32) ¶ 5, Ex. C (Dkt. # 32-3) ("2011 Perf. Eval.") at 1-2.)  Although his supervisor

6  indicated that he "was very much in a learning capacity during [the 2011] review period,"

7  Mr. Golafale's lowest score in any review category was "successful," which indicates

8  that he "fully m[et] standards and expectations."  (*Id.*)

9          In 2013, Lashunda Johnson took over as Mr. Golafale's supervisor and Polly Clark

10  took over as his manager.  (1st Dammel Decl. ¶ 11, Ex. H ("2012 Perf. Eval.") at 1.)  Ms.

11  Johnson and Ms. Clark completed Mr. Golafale's performance review for 2012, which

12  largely mirrored his 2011 review.  (*See id.* at 2.)  Mr. Golafale "me[t] the minimum

13  expectations of [the refund specialist team's] productivity standards" and took "great care

14  to minimize any absences."  (*Id.*; *see also id.* at 3 ("Kept absences at a very low rate of

15  occurrence.").)  However, Ms. Johnson once noticed Mr. Golafale giving a trainer

16  "attitude," felt that Mr. Golafale's performance was "below average," and indicates that

17  he did not "fully grasp what he was working on."  (Johnson Decl. (Dkt. # 22) ¶¶ 3-4.)

18  Ms. Clark states that she and Ms. Johnson "rated most employees as meeting

19  expectations" for this period due to their "short time overseeing Refunds and the

20  overwhelming workload running two groups."  (Clark Decl. (Dkt. # 21) ¶ 3.)  Despite

21  these observations, neither Ms. Clark nor Ms. Johnson made reference to them in Mr.

22  Golafale's 2012 performance review.  (2012 Perf. Eval. at 1-3.)

**B.      The Hiring and Promotion of Joshua Henriot**

In February 2013, Swedish hired Joshua Henriot through a temp agency to serve as a refund specialist. (Watts Decl. (Dkt. # 32) ¶ 4, Ex. B (Dkt. # 32-2) ("Henriot Dep.") at 29:14-17.) Mr. Henriot served in that position for approximately eight months, working alongside Mr. Golafale after Mr. Golafale helped to train him. (*Id.* at 29:16-24; Golafale Decl. ¶ 7.) In October 2013, Swedish promoted Mr. Henriot to supervisor of the refunds unit.[4] (Henriot Dep. at 38:2-25, 45:13-15; Golafale Decl ¶ 7.)

Mr. Golafale, on the other hand, had applied for approximately 60 different positions within Swedish during his tenure there, and he received only one interview and no job offers. (*See* Watts Decl. ¶ 6, Ex. D at 1; Golafale Decl. ¶ 8.) As Mr. Golafale acknowledges, he did not meet the formal requirements for some of those positions. (*See* MSJ Resp. at 4; Watts Decl. Ex. D at 1.) However, Mr. Golafale felt that he "had education, experience, and qualifications to perform" those jobs. (Golafale Decl. ¶ 8.) Mr. Golafale did not see a listing for supervisor of the refunds unit and was not alerted of

---

[4] Mr. Golafale asserts that Mr. Henriot "was informed by his white boss that a supervisory position had come open in the Refunds Unit." (MSJ Resp. at 4; *see also* Pr. to MSJ Resp. at 7-8.) As support for that proposition, Mr. Golafale cites to Exhibit B of Ms. Watts's declaration, which is the transcript of Mr. Henriot's deposition, "at p. 23, lines 19-23; p. 24, lines 8-22." (*See* MSJ Resp. at 3-4; *see also* Pr. to MSJ Resp. at 7-8.) Irrespective of whether these page numbers are intended to refer to those generated by the court's electronic filing system or those inherent to the deposition transcript, the cited evidence fails to support Mr. Golafale's contention. Pages 23 and 24 of the deposition transcript pertain to Mr. Henriot's employment prior to joining Swedish. (*See* Watts Decl. Ex. B at 23:19-24:22.) Pages 23 and 24 of the ECF pagination correspond to pages 38 and 45 of the transcript of Mr. Henriot's deposition. (*See id.* at 38, 45.) Although pages 38 and 45 of the transcript address Mr. Henriot's attainment of the position in October 2013, nowhere do they indicate how or when he became aware of the job. (*See id.*)

ORDER- 4

1   the opening, and he attests that he would have applied if he had learned of the position

2   that Mr. Henriot eventually obtained.  (*Id.* ¶ 9.)

3   **C.     Mr. Golafale's Final Written Warning**

4           Barring extenuating circumstances, Swedish handled requests for time off over the

5   holidays on a first-come, first-served basis.  (10/28/15 Golafale Dep. at 103:5-12.)

6   Requests for the 2013 holiday season opened in September, and Ms. Johnson "award[ed]

7   as many as possible while maintaining adequate coverage."  (Johnson Decl. ¶ 5.)

8   Employees submitted time off requests through an electronic time system, which also

9   tracked whether those requests had been approved.  (Golafale Decl. at 104:18-21,

10  107:24-108:3.)

11          On October 8, 2013, Ms. Johnson emailed a group, included Mr. Golafale, to

12  indicate that Swedish would "not approv[e] any additional time off requests for the

13  holidays at this time."  (1st Dammel Decl. ¶ 12, Ex. I at 1.)  Mr. Golafale had not yet

14  submitted an electronic request for time off.  (10/28/15 Golafale Dep. at 104:18-25.)

15  Nevertheless, he indicated that as of October 8, 2013, he had "discussed" with Ms. Clark

16  his plans to take November 29, 2013, off of work for a trip to Portland, Oregon.  (*Id.* at

17  103:17-104:3 ("I had discussed [the trip to Portland] before the email and after the email

18  and prior to the email, prior to the eve of my departure.  I told Ms. Clark verbally.  One

19  time she was down—the last time I remember, she was down, doing her routine, walk-

20  around in our cube, twice, that I had extenuating circumstances that let—that made it

21  difficult for me to report back to work the day after Thanksgiving since I was going to be

22  in Oregon.  She was well aware of that.  I informed her, and we had a discussion.").)  Mr.

1   Golafale indicates that he "mentioned" his trip "three or four times," including prior to

2   the October 8, 2013, email. (10/28/15 Golafale Dep. at 104:13-17.)  According to Mr.

3   Golafale, "Ms. Clark assured [him] it would be fine to take the day off, despite the lack of

4   a formal response in the personnel system." (Golafale Decl. ¶ 10.)

5        Ms. Clark, however, indicates that her only such conversation with Mr. Golafale

6   occurred around November 18, 2013. (Clark Decl. ¶¶ 6-8.)  Ms. Clark declares that she

7   told Mr. Golafale that she "could not approve that day off, and that he was going to need

8   to work with Ms. Johnson to see if there would be enough coverage to allow him that day

9   off." (*Id.* ¶ 7.)  On November 18, 2013, Mr. Golafale submitted a written request to take

10  off November 29, 2013, which was the Friday after Thanksgiving. (*Id.*; 10/28/15

11  Golafale Dep. at 107:6-23.)  Ms. Johnson, having already approved all possible requests

12  for November 29, told Mr. Golafale that "the request was or would be rejected" (Clark

13  Decl. ¶ 6), and she never spoke to Mr. Golafale "about this topic at all during the 2013

14  holidays." (Johnson Decl. ¶ 6.)  Mr. Golafale acknowledges that his electronic request

15  was never approved. (Golafale Decl. ¶ 10.)

16       On November 27, 2013, Mr. Golafale called in sick to attend his annual physical.

17  (10/28/15 Golafale Dep. at 165:17-21; 1st Dammel Decl. ¶ 13, Ex. J at 1; *id.* ¶ 17, Ex. N

18  at 1.)  That day, Mr. Henriot emailed Ms. Clark and Ms. Johnson indicating his belief that

19  Mr. Golafale "planned on calling in and being out on Friday regardless of what anyone

20  approved or disapproved." (Watts Decl. ¶ 9, Ex. G (Dkt. # 32-7) ("11/27/13 Email") at

21  1.)  The following day was a holiday, and Mr. Golafale failed to show up or call in on

22  Friday, November 29, 2013.  (1st Dammel Decl. Ex. J at 1.)  Mr. Golafale indicates he

ORDER- 6

1  took off November 29 only "in reliance on Ms. Clark's assurance that it would be fine to"

2  miss work that day.  (Golafale Decl. ¶ 11.)

3          After learning that Mr. Golafale failed to show up for work on November 29,

4  2013, Mr. Henriot spoke to Ms. Clark and Ms. Johnson about the absence.  (2d Dammel

5  Decl. ¶ 2, Ex. A ("Henriot Dep.") at 57:21-58:12.)  Sandra Milard, the human resources

6  partner at Swedish, informed that conversation by providing an interpretation of the

7  company's attendance policy.  (2d Dammel Decl. ¶ 3, Ex. B ("Milard Dep.") at

8  13:2-14:7.)  Swedish's employment handbook provides for automatic termination when

9  an employee fails to show up or call—referred to as a "no-show no-call"—for more than

10  one day.  (Id. at 15:12-16; 1st Dammel Decl. ¶ 9, Ex. F ("Empl. Handbook") at 32.)

11  Swedish's unwritten policy was to give a final written warning for a single-day no-show

12  no-call.  (Milard Dep. at 15:17-16:2, 16:11-15.)

13          When Mr. Golafale returned to work on December 2, 2013, Mr. Henriot issued

14  Mr. Golafale a "final written warning" for his no-show no-call on November 29, 2013.

15  (Golafale Decl. ¶ 12; 1st Dammel Decl. ¶ 14, Ex. K ("Final Written Warning") at 1.)  The

16  final written warning cautioned that Mr. Golafale was to have "no other instances of not

17  showing up for work and not calling in."  (Final Written Warning at 1.)  Mr. Golafale

18  spoke to Melody Albrecht, the "head of the department," who assured Mr. Golafale that

19  "if [he] ignored the warning and had no further attendance issues, it would have no

20  negative effects on [his] employment at Swedish."  (Golafale Decl. ¶ 13.)  Accordingly,

21  Mr. Golafale neither wrote a statement for his personnel file nor appealed the disciplinary

22  action, the other two options Ms. Albrecht posed.  (Id. ¶ 12.)

ORDER- 7

**D.      Mr. Golafale's FMLA Leave in December 2013**

On December 6, 2013, feeling "stressed and overwhelmed" by the "unfair treatment and unwarranted discipline," Mr. Golafale visited his doctor of more than a decade, Dr. Maria Flores, who diagnosed him with "major depression." (Golafale Decl. ¶ 15; 10/28/15 Golafale Dep. at 140:6-14; Flores Decl. (Dkt. # 31) ¶ 2.) Dr. Flores advised Mr. Golafale to "take a short leave of absence from work" and completed the appropriate certification paperwork under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"). (Flores Decl. ¶ 2.) Dr. Flores further indicated a six-month period in which symptoms of Mr. Golafale's depression and diabetes would include "inability to concentrate, significant fatigue, hypersomnia, and a general sense of feeling overwhelmed." (*Id.* ¶ 3, Ex. A ("FMLA Certification") at 3.) However, Dr. Flores informed Swedish that Mr. Golafale would not "need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of [his] medical condition." (*Id.* at 4.)

The following work day, December 9, 2013, Mr. Golafale met with Jennifer Mellish to request leave under the FMLA. (10/28/15 Golafale Dep. at 159:5-14.) As recommended by Dr. Flores and requested by Mr. Golafale, Swedish granted Mr. Golafale FMLA leave from December 11, 2013, through December 20, 2013. (Golafale Decl. ¶ 15; FMLA Certification at 4; Dammel Decl. ¶ 19, Ex. P ("FMLA Leave Req.") at 1.) Despite having the option to request intermittent leave or a reduced work schedule, Mr. Golafale indicated only a need for continuous leave from December 11 through December 20, 2013. (FMLA Leave Req. at 1.) Mr. Golafale came to work on December

1   10, 2013, but Mr. Henriot granted his request to leave at noon that day.  (1st Dammel

2   Decl. ¶ 21, Ex. R.)

3      On December 12, 2013, Ms. Mellish, on behalf of Swedish, officially approved

4   Mr. Golafale's FMLA leave effective December 11, 2013, through December 20, 2013.

5   (1st Dammel Decl. ¶ 23, Ex. T ("FMLA Approval") at 1.)  That approval letter instructed

6   Mr. Golafale that, "[s]hould the need for intermittent leave and/or a reduced work

7   schedule arise, please notify your manager and [Ms. Mellish] as soon as possible.

8   Documentation must be received from your healthcare provider certifying this need."

9   (*Id.*)  Mr. Golafale acknowledges that he never notified his manager or Ms. Mellish about

10  a need for intermittent leave or a reduced work schedule.  (10/28/15 Golafale Dep. at

11  182:21-183:3; 1st Dammel Decl. ¶ 24, Ex. U ("1/21/16 Golafale Dep.") at 50:25-51:5.)

12     Mr. Golafale spent some of his time on FMLA leave pursuing other job

13  opportunities.  On December 10, 2014, he sent an email indicating that he "intend[ed] to

14  use of every once [sic] of [his] benefit [sic]" before leaving Swedish, and that he

15  "hope[d] to god" to "find a temporary job of some kind to get [him] out [of Swedish]."

16  (1st Dammel Decl. ¶ 25, Ex. V at 1.)  During his FMLA leave, Mr. Golafale also set up

17  job interviews with AXA Advisors and Aflac Insurance.  (*Id.* ¶¶ 26, 28, Exs. W, X.)

18  Although Mr. Golafale initially denied taking those interviews, when presented with the

19  relevant confirmation emails he acknowledged that he had scheduled interviews during

20  his FMLA leave.  (1/21/16 Golafale Dep. at 51:19-52:7, 55:2-56:17.)

21  //

22  //

ORDER- 9

**E.      Mr. Golafale's Return to Work**

Mr. Golafale's first scheduled day of work following his FMLA leave was December 23, 2013, but he obtained a doctor's note excusing him from work on December 23 and December 24, 2013, due to a cold.  (*See* 1st Dammel Decl. ¶ 29, Ex. Y at 1; 10/28/15 Golafale Dep. at 187:6-18.)  Mr. Golafale did not work on December 25 due to a holiday, and he returned to work on December 26, 2013.  (10/28/15 Golafale Dep. at 188:6-12.)

Upon his return, Mr. Golafale met with Mr. Henriot and indicated that he "did not have time to complete everything that [his] physician wanted [him] to before coming back to work."  (1st Dammel Decl. ¶ 30, Ex. Z ("12/26/13 Henriot Email") at 1; 10/28/15 Golafale Dep. at 188:20-189:19.)  Mr. Henriot emailed Mr. Golafale after the conversation to encourage Mr. Golafale to contact Ms. Mellish to educate himself on FMLA types and follow his doctor's orders by making a visit to the doctor before returning to work.  (12/26/13 Henriot Email at 1.)  That email also indicates that Mr. Henriot provided his contact numbers so that Mr. Golafale could contact Mr. Henriot directly whenever he had "an employment related issue or question," including "calling [Mr. Henriot] when [Mr. Golafale was] not going to make it in to work or [when he] would be late."  (*Id.*)

On December 31, 2016, Mr. Golafale returned to Dr. Flores to follow up on his FMLA leave.  (1st Dammel Decl. ¶ 31, Ex. AA ("12/31/13 Doc. Note") at 1; *see also* 10/28/15 Golafale Dep. at 190:10-20.)  Dr. Flores indicated that Mr. Golafale "[w]ants to

1  take intermittent FMLA as suggested by his manager." (12/31/13 Doc. Note at 2.)

2  However, she denied that request and noted

> [a]t this time, patient is not interested in antidepressants or counseling. We discussed the purpose of FMLA. His diabetes is not severe enough as well to warrant p.r.n. intermittent FMLA. It would be very difficult to justify getting intermittent FMLA for his condition specially [sic] since he is currently not getting any other treatment.

6  (*Id.*; *see also* 10/28/15 Golafale Dep. at 192:7-22.) After Dr. Flores denied Mr.

7  Golafale's request for intermittent FMLA leave, Mr. Golafale considered but declined to

8  obtain a second medical opinion. (10/28/15 Golafale Dep. at 192:10-24.) On January 2,

9  2014, having received no request for an extension, Swedish's leave administrator

10  informed Mr. Golafale that it would close the file pertaining to his December 2013

11  FMLA leave. (1st Dammel Decl. ¶ 33, Ex. CC ("FMLA Closure Letter") at 4 ("If you

12  need restrictions or accommodations, please follow-up with your HR contact for further

13  support.").)

14  **F.    Mr. Golafale's Performance and Attendance**

15  In the fourth quarter of 2013, Mr. Golafale's productivity metrics were subpar.

16  (1st Dammel Decl. ¶ 34, Ex. DD ("PIP") at 1.) In response, Mr. Henriot and Ike Duran

17  coached Mr. Golafale regarding productivity and wrote up a "performance improvement

18  plan," which they provided to Mr. Golafale on approximately February 28, 2014. (*Id.*;

19  10/28/15 Golafale Dep. at 99:15-23.) The plan indicated that Mr. Golafale attained a

20  48.75 percent score on his quality audit, which has a passing score of 95 percent, and

21  performed 3.94 transactions per hour, which is far below the passing rate of 10

22  transactions per hour. (PIP at 1.) The plan also made reference to two prior performance

1  coaching session in 2014, which were due to a failing quarterly audit for the fourth

2  quarter of 2013. (*Id.*)

3       Although Mr. Henriot and Mr. Duran also provided improvement strategies in

4  prior coaching sessions, the February 28, 2013, performance improvement plan further

5  required Mr. Golafale to submit a "list of training needs" in order to meet tiered

6  improvement goals in quality and productivity over the span of six weeks. (*Id.* at 1-2.)

7  Finally, the plan indicated that "[f]urther occurrences of not making benchmark may

8  result in further counseling up to and including termination." (*Id.* at 2.)

9       Mr. Golafale also struggled to timely arrive at work in 2013. (*See* 2d Henriot

10  Decl. (Dkt. # 42) ¶ 2, Ex. A ("Golafale Tardy Records") at 1; *see also id.* ¶ 5, Ex. D

11  ("Golafale Weekly Schedule") at 1.) Sometime in 2013, Swedish changed from a

12  flexible schedule, in which employees could put in their eight daily hours during a

13  flexible time range, to a fixed system, in which employees had a fixed start time and end

14  time. (2d Pr. to Watts Decl. ¶ 4, Ex. P ("Duran Dep.") at 49:18-21.) That year Mr.

15  Golafale arrived late to work 33 times, which "popp[ed] out as the anomaly" because the

16  average Swedish employee arrived late only five times over the same span.[5] (1st

17  Dammel Decl. ¶ 38, Ex. HH ("3/27/15 Duran Email") at 1; *id.* ¶ 39, Ex. II ("2013 Perf.

18  Eval.") at 2.) Mr. Golafale continued to arrive late in 2014. (*See, e.g., id.* ¶ 40, Ex. JJ

19  ("4/1/14 Counseling Note") at 1.) Ms. Milard, who is responsible for informing

20  managers when termination is acceptable, gave Mr. Duran approval to terminate Mr.

21  _____

22      [5] Swedish provided employees five minutes of leeway before classifying them as tardy for any given day. (*See* Duran Dep. at 46:8-9.)

ORDER- 12

1  Golafale in early March 2014.  (Milard Dep. at 45:8-15; Duran Dep. at 38:2-12.)

2  However, Mr. Duran instead opted to counsel Mr. Golafale in an effort to "get him back

3  on track."  (Duran Dep. at 38:15-17.)  In total, Mr. Duran and Mr. Henriot met with Mr.

4  Golafale three or four times regarding his tardiness, and at least some of those meetings

5  occurred after Ms. Milard gave Mr. Duran and Mr. Hentiot approval to terminate Mr.

6  Golafale.  (*Id.* at 38:2-12; Henriot Dep. at 98:21-99:2.)

7          One such meeting occurred on March 28, 2014, when Mr. Henriot and Mr. Duran

8  met with Mr. Golafale to review Mr. Golafale's 2013 performance—specifically, his

9  productivity deficiencies and excessive absenteeism and tardies.  (Duran Decl. (Dkt.

10  # 23) ¶ 4.)  Mr. Golafale's performance evaluation for 2013, which Mr. Duran and Mr.

11  Henriot prepared, indicates that he did not meet expectations in any category, and he

12  received the lowest mark possible for dependability.[6]  (2013 Perf. Eval. at 1-3.)  In light

13  of his final written notice, Mr. Duran especially sought to bring Mr. Golafale's late

14  arrivals to his attention.  (3/27/15 Duran Email at 1.)  Mr. Henriot followed up with Mr.

15  Golafale reemphasizing the importance of attendance and punctuality and approving Mr.

16  Golafale's request for a flexible schedule the following week due to a doctor's

17  appointment.  (1st Dammel Decl. ¶ 41, Ex. KK ("3/28/14 Emails") at 1.)

18          Despite preparing his own schedule for the following week, Mr. Golafale arrived

19  18 minutes late for his next day of work, which was Monday, March 31, 2014.  (3/28/14

20  _____

21          [6] In contrast, Mr. Golafale gave himself the highest mark for each category and declined
22  to include any comments on his 2013 self-review.  (Watts Decl. ¶ 19, Ex. Q ("3/11/14 Henriot
    Email") at 1.)

1    Emails at 2; 4/1/14 Counseling Note at 1.)  He arrived six minutes late on Tuesday and

2    was again counseled that day regarding his attendance and punctuality.  (4/1/14

3    Counseling Note at 1.)  Nonetheless, he arrived 10 minutes late on Wednesday, six

4    minutes late on Thursday, and 47 minutes late on Friday, April 4, 2014.  (*See id.*; 3/28/14

5    Emails at 2.)  When asked about these late arrivals, Mr. Golafale indicated that he had no

6    pertinent medical excuses.  (Golafale Dep. at 211:12-15.)  Mr. Golafale then "called out"

7    and was absent for his next three workdays on April 7-9, 2014, and arrived 13 minutes

8    late on April 10, 2014.  (1st Dammel Decl. ¶ 42, Ex. LL ("Term. Letter") at 1.)

9    **G.    Swedish's Termination of Mr. Golafale**

10           Swedish terminated Mr. Golafale on April 11, 2014, for violating Swedish's

11   standards of conduct.  (*Id.* at 1-2.)  Mr. Duran confirmed the termination via a letter,

12   which traced Mr. Golafale's history of attendance issues, including his December 2,

13   2013, final written warning, and identified Mr. Golafale's April 2014 tardiness and

14   absences as "the final incident(s) which led to the decision to terminate [Mr. Golafale's]

15   employment."  (*Id.* at 1.)

16   **H.    Mr. Golafale's Lawsuit**

17           Mr. Golafale alleges five causes of action against Swedish.  Three of those causes

18   of action contain claims that Swedish intentionally discriminated against Mr. Golafale on

19   the basis of his race or national origin.  (*See* Compl. ¶¶ 5.1-5.4 (alleging discrimination in

20   violation of 42 U.S.C. § 1981 ("Section 1981")), 6.1-6.4 (alleging discrimination in

21   violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e,

22   *et seq.*), 8.1-8.3 (alleging discrimination in violation of the Washington Law Against

ORDER- 14

1  Discrimination ("WLAD"), RCW 49.60.010, *et seq.*).)  The other two causes of action

2  contain claims that Swedish failed to accommodate Mr. Golafale's disabilities of diabetes

3  and depression.  (*See id.* ¶¶ 7.1-7.4 (alleging failure to accommodate in violation of the

4  Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*), 9.1-9.3 (alleging

5  failure to accommodate in violation of the WLAD).)  Mr. Golafale seeks actual economic

6  damages stemming from the alleged violations, reinstatement, and punitive damages.[7]

7         Swedish moved for summary judgment on all five of these claims.  (*See* MSJ at 3.)

8  Mr. Golafale opposed the motion (*see* MSJ Resp. (Dkt. # 29)), Swedish replied in support

9  of its motion (*see* MSJ Reply (Dkt. # 40)), and the court held oral argument on March 31,

10  2016 (*see* Dkt. # 53).

## III.   ANALYSIS

12  **A.    Legal Standard**

13        Summary judgment is appropriate if the evidence, when viewed in the light most

14  favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

15  any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

16  P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of*

17  *L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of

18  showing that there is no genuine issue of material fact and that he or she is entitled to

19  prevail as a matter of law. *Celotex*, 477 U.S. at 323.  If the moving party meets his or her

---

21        [7] Although Mr. Golafale alleged emotional damages (Compl. ¶¶ 5.3, 6.3, 8.3, 10.2), he

22  has since dismissed his plea for that form of relief (*see* 2/16/16 Stip. (Dkt. # 25) at 1; 2/18/16 Order (Dkt. # 26) at 2).

1   burden, then the non-moving party "must make a showing sufficient to establish a

2   genuine dispute of material fact regarding the existence of the essential elements of his

3   case that he must prove at trial" in order to withstand summary judgment. *Galen*, 477

4   F.3d at 658.  The non-moving party may do this by use of affidavits (or declarations),

5   including his or her own, depositions, answers to interrogatories or requests for

6   admissions. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

7          The court may only consider admissible evidence when ruling on a motion for

8   summary judgment. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773-75 (9th Cir. 2002).

9   "Legal memoranda and oral argument are not evidence and do not create issues of fact

10  capable of defeating an otherwise valid summary judgment." *Estrella v. Brandt*, 682

11  F.2d 814, 819-20 (9th Cir. 1982); *see also Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d

12  1074, 1078 (9th Cir. 2003) ("Conclusory allegations unsupported by factual data cannot

13  defeat summary judgment.").

14         The court is "required to view the facts and draw reasonable inferences in the light

15  most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

16  Only disputes over the facts that might affect the outcome of the suit under the governing

17  law are "material" and will properly preclude the entry of summary judgment. *Anderson*,

18  477 U.S. at 248.  The nonmoving party "must do more than simply show that there is

19  some metaphysical doubt as to the material facts . . . . Where the record taken as a whole

20  could not lead a rational trier of fact to find for the nonmoving party, there is no genuine

21  issue for trial." *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting

22  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  As

framed by the Supreme Court, the ultimate question on a summary judgment motion is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

**B.      Motion for Summary Judgment**

      1.   Intentional Discrimination Claims

      In the absence of direct evidence of discriminatory intent,[8] courts evaluate discrimination claims under Title VII, Section 1981, and the WLAD using the *McDonnell Douglas* framework. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973)); *Manatt v. Bank of Am., NA*, 339 F.3d 792, 797 (9th Cir. 2003); *see also Kastanis v. Educ. Emp. Credit Union*, 859 P.2d 26, 30 (Wash. 1993) ("This court has adopted the standard articulated by *McDonnell Douglas* in discrimination cases that arise out of RCW 49.60.180 [the WLAD] and the common law."). That framework requires the plaintiff to make out a prima facie case showing (1) that he or she was a member of a protected class, (2) that he or she was qualified for and performing adequately in the position in question, (3) that he or she suffered an adverse employment action, and (4) either (a) that similarly situated employees outside the protected class were treated more favorably, or (b) that other circumstances surrounding the adverse action give rise to an inference of

_____

[8] By beginning his discussion of intentional discrimination with reference to the *McDonnell Douglas* framework, Mr. Golafale implicitly acknowledges that there is no direct evidence of discriminatory intent in the record. (*See* MSJ Resp. at 12-13.)

discrimination. *See Cornwell*, 439 F.3d at 1028; *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).

"If the plaintiff establishes a prima facie case, the burden of production—but not persuasion—then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002) (citing *McDonnell Douglas*, 411 U.S. at 802). If the employer satisfies this burden of production, the burden shifts back to the plaintiff to show "that the articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000)). "Circumstantial evidence of pretext must be specific and substantial in order to survive summary judgment." *Bergene v. Salt River Project Agric. Improvement and Power Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001).

Although the court doubts whether Mr. Golafale has met his prima facie burden, it need not address this question.[9] Swedish has submitted substantial evidence demonstrating a legitimate, nondiscriminatory reason for firing Mr. Golafale—his inability to comply with the terms and perform the essential functions of his employment.

---

[9] The court is particularly skeptical that a reasonable factfinder could conclude that Mr. Golafale "was performing his job well enough to rule out the possibility that he was fired for inadequate job performance." *Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 672 (9th Cir. 1988). However, the court need not decide that issue because Swedish offers a legitimate, nondiscriminatory reason for Mr. Golafale's firing and Mr. Golafale fails to demonstrate pretext.

1  (*See generally* MSJ; MSJ Reply)  Mr. Golafale does not clearly oppose this conclusion in

2  his briefing.  (*See generally* MSJ Resp.)

3          At oral argument, however, Mr. Golafale's counsel argued that Swedish has not

4  met its burden at the second stage of the *McDonnell Douglas* analysis because it did not

5  go through the progressive discipline described in its employment handbook.  Even if the

6  court were inclined to consider this argument, which indirectly appears in Mr. Golafale's

7  briefing only in a footnote to the "statement of facts," the court would reject it.  (*See* MSJ

8  Resp. at 7 n.2 ("In fact, [giving a final written warning on November 29, 2013,] is in

9  direct conflict with Swedish's published policy, which calls for progressive discipline for

10  attendance issues.").)  Although Swedish did not proceed in perfect order, Swedish

11  eventually provided Mr. Golafale every step of the "general guideline of progressive

12  discipline" identified in their employment handbook.  (Empl. Handbook at 32, 34-35.)

13  Moreover, Swedish expressly indicates those guidelines are not obligatory.  (*Id.* at 35

14  ("The corrective actions below are a general guideline . . . . Depending upon the

15  circumstances and the seriousness of the situation, [Swedish] will determine the most

16  appropriate course of action to take.  Corrective action may start with any of the action

17  options below. . . . [Swedish] at all times reserves the right to discharge with or without

18  cause or notice if it is deemed in the organization's best interest."); *cf.* MSJ Resp. at 7; Pr.

19  to MSJ Resp. at 11.)  Mr. Golafale's deficient performance and attendance issues—past

20  and present—suffice to satisfy Swedish's burden.  The burden then shifts to Mr. Golafale

21  to demonstrate that Swedish's proffered explanation is pretextual.  *See Villiarimo*, 281

22  F.3d at 1062.

1    Although Mr. Golafale's briefing is opaque on this issue, he makes three

2  arguments that could be construed as applying to pretext.[10]  (MSJ Resp. at 14-16.)  First,

3  he points to the manner in which Swedish disciplined him for missing work on November

4  29, 2013.  (*Id.* at 14-15.)  Second, he argues that Swedish decided to terminate him a

5  week before he was actually terminated.  (*Id.* at 15.)  Third, Mr. Golafale argues that

6  Swedish treated him significantly differently than K.H.,[11] a white employee who Mr.

7  Golafale contends was otherwise similarly situated.  (*Id.* at 15-16.)  None of these

8  arguments demonstrate that "the employer's proffered explanation is unworthy of

9  credence."  *Chuang*, 225 F.3d at 1123.

10    Mr. Golafale attests that he had a conversation with Ms. Clark, who assured him

11  that "it would be fine to take" November 29, 2013, off "despite the lack of a formal

12  response in the personnel system."  (Golafale Decl. ¶ 10.)  He further points to an email

13  conversation between Mr. Henriot, Mr. Johnson, and Ms. Clark, which indicates that the

14  three of them knew on November 27, 2013, that Mr. Golafale planned to be absent

15  without permission on November 29, 2013, but nonetheless failed to inform him that the

16  absence would be unexcused.  (11/27/13 Email at 1.)

17

18
    ─────────────────────

19    [10] Only two pages of Mr. Golafale's briefing conceivably pertain to pretext, and he did
    not label that section as such.  (MSJ Resp. at 14-16.)  In those two pages, Mr. Golafale cited to
    the record only twice.  (*See id.* at 14-16 & n.4.)  The court will not scour the record or entire

20  documents in the record in search of evidence to support a party's position.  *See United States v.
    Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried

21  in briefs.").

22    [11] In the interest of privacy, the parties have agreed to identify K.H. only by her initials.
    (*See* Watts Decl. ¶ 15.)

ORDER- 20

1    The undisputed evidence demonstrates a subsequent four-month period in which

2  Mr. Golafale frequently arrived late at work and performed at a substandard level. (*See*

3  Golafale Tardy Records at 1; PIP at 1; 4/1/14 Counseling Note at 1.)  Mr. Golafale

4  emphasizes the role that the resulting final written notice played in his termination and

5  posits that "[i]t is undisputed that Mr. Golafale did not have any issues with attendance

6  until" November 29, 2013.  (MSJ Resp. at 9.)  However, Mr. Golafale in fact arrived late

7  for work on 25 occasions between April 10, 2013, and November 29, 2013, and received

8  numerous formal and informal counseling sessions regarding his attendance. (*See*

9  Golafale Tardy Records at 1; Term. Letter at 1.)  These facts belie Mr. Golafale's

10  contention that the unwarranted prior written notice triggered his attendance issues.

11    The difference between Mr. Golafale's attendance record and that of K.H., his

12  self-selected comparator, demonstrates that Mr. Golafale's attendance figures warranted

13  attention and discipline irrespective of the events leading up to November 29, 2013.[12]

14  Mr. Golafale misreads K.H.'s personnel records to indicate "53 instances of unplanned or

15  unpaid leave in 2013." (Resp. at 11.)  Although K.H.'s records evince a substantial

16  number of late arrivals between April 3, 2013, and March 25, 2014, the majority of those

17  late arrivals were excused pursuant "FMLA intermittent leave and the Seattle Sick and

18  Safe law." (2d Henriot Decl. ¶ 6, Ex. C (Dkt. # 42-1) ("K.H. Tardy Report") at 1-2.)

19  K.H. only had 14 unexcused late arrivals during that nearly yearlong period. (2d Henriot

20  Decl. ¶ 6.)

21  _____

22    [12] K.H, a white woman, was Mr. Golafale's coworker in the refunds group. (Watts Decl.
¶ 15; 1st Henriot Decl. (Dkt. # 20) ¶ 6.)

ORDER- 21

1    Mr. Golafale also differentiates the treatment that K.H. received to coach her

2  through her attendance issues.  (MSJ Resp. at 11.)  Ms. Albrecht confirms that K.H. was

3  "coached" at one point due to "an attendance issue."  (Watts Decl. ¶ 11, Ex. I at 34:3-14.)

4  Typically, that begins with a conversation between the employee and "the supervisor or

5  manager."  (*Id.* at 34:11-23.)  Mr. Golafale fails to demonstrate how this process differs

6  from the treatment Swedish afforded him.  Following his FMLA leave, Mr. Golafale

7  received no shortage of consultations from his superiors encouraging him to protect his

8  health and offering to help resolve his attendance problems.  (*See* 12/26/13 Henriot Email

9  at 1 ("[T]his indicates that you may need more time on your FMLA. . . . I highly

10  encouraged you to follow your doctor's orders regarding the requested visit before going

11  back to work."); FMLA Closure Letter at 4 ("If you need restrictions or accommodations,

12  please follow-up with your HR contact for further support."); PIP at 2 (requesting "a list

13  of training needs you feel you require to assist you with meeting our expectations");

14  3/28/14 Emails at 1-4 (approving Mr. Golafale's request for an altered work schedule for

15  the week of March 31, 2014, through April 4, 2014).)

16    Finally, Mr. Golafale fails to identify any indication of deficient performance—as

17  contrasted with deficient attendance—by K.H., which contrasts with the evaluation he

18  received on March 28, 2013.  (2013 Perf. Eval. at 1-3.)  Without reference to a specific

19  page, Mr. Golafale refers the court to K.H.'s 62-page personnel file, but its contents only

20  further highlight the differences between K.H. and Mr. Golafale.  (*See, e.g.*, Watts Decl.

21  ¶ 15, Ex. M ("K.H. File") at 5 ("You now have a total of five unplanned occurrences in

22  the rolling twelve month period of March 17, 2010 to March 18, 2011."), 33-36 (evincing

1   that K.H.'s performance in 2013 was better that Mr. Golafale's in each of the seven

2   categories reviewed at Swedish, based on a performance evaluation completed by the

3   same supervisors); *cf.* 2013 Perf. Eval. at 1-3.)  In sum, K.H.'s workplace issues were

4   few, minor, and fleeting in comparison to Mr. Golafale's. (*See generally* K.H. File.)  As

5   a comparator, therefore, K.H. fails to demonstrate that Swedish's proffered reason for

6   terminating Mr. Golafale was pretextual.

7         The court also finds unpersuasive Mr. Golafale's argument regarding the timing of

8   Swedish's decision to terminate Mr. Golafale.  (*See* MSJ Resp. at 15.)  Mr. Golafale met

9   with management regarding his absenteeism and late arrivals on March 28, 2014, and

10  prepared his own schedule for the workweek of March 31 through April 4, 2014.

11  (3/28/14 Emails at 2; 4/1/14 Counseling Note at 1.)  He nonetheless arrived 18 minutes

12  late on Monday, March 31, had another, similar meeting on Tuesday of that week, and

13  still arrived more than five minutes late to work every single day of that week.  (4/1/14

14  Counseling Note at 1.)  Even before he "called out" and was absent for his next three

15  workdays and arrived 13 minutes late on April 10, 2014, there is no evidence that

16  Swedish's proffered reason for termination was pretext for discrimination.  (*See* Term.

17  Letter at 1.)  Because Swedish already had a legitimate, nondiscriminatory reason to

18  terminate Mr. Golafale's employment as of the date they determined they would do so, it

19  //

20  //

21  //

22  //

1 is inconsequential that Swedish eventually identified Mr. Golafale's later absences and

2 tardiness in his termination letter.[13]  (*See id.*; *see also* 1st Henriot Decl. ¶ 5.)

3         Even assuming Mr. Golafale satisfied his prima facie burden, Swedish provided

4 ample evidence of a legitimate, nondiscriminatory reason for firing Mr. Golafale.  In

5 reply, Mr. Golafale fails to "prove pretext 'either directly by persuading the court that a

6 discriminatory reason more likely motivated the employer or indirectly by showing that

7 the employer's proffered explanation is unworthy of credence.'"[14]  *Raad v. Fairbanks N.*

8

_____

9    [13] At oral argument, counsel for Mr. Golafale made the additional argument that
10 Swedish's unsubstantiated assertion that Mr. Golafale was late more than 50 times in a year
   constitutes further evidence of pretext.  This argument, which could also undermine Swedish's
11 burden at the second stage of the *McDonnell Douglass* framework, is unavailing because the
   record indeed substantiates Mr. Golafale's deficient attendance record.  Swedish has provided
12 Mr. Golafale's typical weekly schedule (Golafale Weekly Schedule at 1; *see also* 2d Dammel
   Decl. ¶ 5, Ex. D at 3), which Mr. Golafale confirmed was his schedule from the fall of 2013 until
13 he left Swedish in 2014 (10/28/15 Golafale Dep. at 79:5-14, 80:10-14); the timestamp for the
   days on which Mr. Golafale arrived more than five minutes late (Golafale Tardy Records at 1);
14 an email record of Mr. Golafale altering his typical work schedule (3/28/14 Emails at 2); and
   several contemporaneous communications that further confirm his attendance issue (PIP at 1;
15 4/1/14 Counseling Note at 1; Term. Letter at 1).  Mr. Duran further indicated that whereas
   Swedish used to operate on a flex schedule, it has since switched to a standard schedule "where
16 you have a start time and an end time, and . . . [a]ny changes have to be reported up." (Duran
   Dep. at 49:9-23; *see also id.* at 46:9-13 ("And in addition . . . the schedules are fairly flexible,
   you just need to communicate with us if you need an hour this day, leave early the next day, how
17 you can make it up."); 10/28/15 Golafale Dep. at 80:1-9.)
        It is possible that Swedish imperfectly calculated Mr. Golafale's absences by capturing
18 some late arrivals that Mr. Golafale's supervisors had approved without documentation.  A
   factfinder might reasonably conclude, therefore, that the list of Mr. Golafale's absences is over-
19 inclusive. (*See* 1/21/16 Golafale Dep. at 88:22-24 (characterizing Swedish's count of 50 or more
   late arrivals as "a little bit excessive").)  However, in light of the above evidence, no reasonable
20 factfinder could conclude that Swedish miscalculated Mr. Golafale's late arrivals to the degree
   required to undermine or demonstrate pretext as to Swedish's proffered reason for firing Mr.
   Golafale.

21
    [14] Mr. Golafale also repeatedly alludes to a conspiratorial effort by Swedish employees to
22 set him up for discipline. (*See, e.g.*, MSJ Resp. at 5 ("Mr. Henriot . . . proceeded to set up a trap
   to begin the process of terminating Mr. Golafale's employment."), 7 ("[H]is supervisors . . .

ORDER- 24

1   *Star Borough School Dist.*, 323 F.3d 1185, 1196 (9th Cir. 2003) (quoting *Tex. Dep't of*

2   *Comm. Affairs v. Burdine*, 450 U.S. 248, 257 (1981)).  Accordingly, the court grants

3   summary judgment to Swedish on the intentional discrimination claims.

4       2.  <u>Failure to Accommodate Claims</u>

5       To sustain a failure to accommodate claim under the ADA, Mr. Golafale must

6   show that he "(1) had a disability as defined by the ADA; (2) was qualified to perform

7   the essential functions of [his] job; (3) gave [his] employer notice of [his] disability and

8   limitations; and (4) upon notice, the employer failed to adopt measures available to it in

9   order to accommodate the disability." *Austin v. Boeing Co.*, No. C12-0263MJP, 2013

10  WL 230824, at *4 (W.D. Wash. Jan. 22, 2013).  "A failure to accommodate claim under

11  the WLAD follows the same analysis." *Id.*; *see Roeber v. Dowty Aerospace Yakima*, 64

12  P.3d 691, 697 (Wash. Ct. App. 2003) (requiring the plaintiff to show "that (1) he had a

13  sensory, mental, or physical abnormality that substantially limited his ability to perform

14  the job; (2) he was qualified to perform the job; (3) he gave [his employer] notice of the

15  abnormality and its substantial limitations; and (4) upon notice, [his employer] failed to

16  affirmatively adopt measures available to it and medically necessary to accommodate the

17  abnormality"); *see also* RCW 49.60.040(d).  Once the employer is aware of a disability

18  that may require accommodations, the ADA and the WLAD impose a duty on the

19

20  seemed to be working in concert against him."), 14 ("Mr. Golafale was the target of a pre-
    conceived plan to set him up for discipline. . . . The emails make it clear that Mr. Henriot was

21  actively out to get Mr. Golafale, and nothing was going to stand in his way.").)  Even viewing
    the evidence in the light most favorable to Mr. Golafale, this theory mischaracterizes the

22  underlying evidence, which evinces a concern with Mr. Golafale's attendance and performance
    but does not imply any ill-intentioned collusive effort on the part of Swedish employees.

1  employer and the employee to engage in a good faith, interactive process to identify and

2  provide reasonable accommodations. *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th

3  Cir. 2000), *reversed on other grounds*, 535 U.S. 391 (2002); *Humphrey v. Mem'l Hosps.*

4  *Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001) ("[N]either side can delay or obstruct the

5  process."); *Goos v. Shell Oil Co.*, 451 F. App'x 700, 702 (9th Cir. 2011) (unpublished)[15]

6  (quoting *Barnett*, 228 F.3d at 1113) ("[T]he employee's participation is equally important

7  because he or she generally knows more about his or her capabilities, and 'holds essential

8  information for the assessment of the type of reasonable accommodation which would be

9  most effective.'"); *Goodman v. Boeing Co.*, 899 P.2d 1265, 1269 (Wash. 1995) ("The

10  employee, of course, retains a duty to cooperate with the employer's efforts by explaining

11  her disability and qualifications.").

12       Mr. Golafale's claim fails because the evidence makes clear that Swedish made

13  every effort to engage in a good faith interactive process with Mr. Golafale but Mr.

14  Golafale declined to pursue an accommodation.  Swedish granted Mr. Golafale exactly

15  the FMLA leave that Dr. Flores recommended and Mr. Golafale requested.[16]  (FMLA

16  Leave Req. at 1; (Golafale Decl. ¶ 15; FMLA Approval at 1.)  The form approving his

17  FMLA leave instructed Mr. Golafale to notify his manager and Ms. Mellish if the need

18  for intermittent leave or a reduced work schedule arose, but Mr. Golafale did not do so.

19

20  _____

     [15] Unpublished Ninth Circuit decisions are not precedential but may be cited when issued
21  after January 1, 2007. *See* Ninth Cir. R. 36-3.

22  [16] Dr. Flores also indicated that Mr. Golafale would not need follow-up treatment
     appointments or a part-time or reduced schedule due to his condition. (FMLA Certification at 4.)

1  (FMLA Approval at 1; 10/28/15 Golafale Dep. at 182:21-183:3.)  When Mr. Golafale

2  returned from his FMLA leave, Mr. Henriot recommended that he return to his doctor

3  and seek further FMLA leave.  (12/26/13 Henriot Email at 1.)  At that time, Dr. Flores

4  rejected Mr. Golafale's request for intermittent FMLA leave.  (12/31/13 Doc. Note.)

5  Swedish also informed Mr. Golafale in January 2014 that he should follow up with

6  human resources if he needed "restrictions or accommodations."  (1st Dammel Decl ¶ 33,

7  Ex. CC at 4.)

8       Notwithstanding the lack of response from Mr. Golafale, Swedish continued its

9  efforts to work with Mr. Golafale to improve his performance and attendance.  Mr. Duran

10  and Mr. Henriot counseled him several times in 2014 and generated a tiered performance

11  improvement plan.  (Duran Dep. at 38:15-17; Henriot Dep. at 98:21-99:2; PIP at 1.)  That

12  plan warned Mr. Golafale of the possibility of termination and invited him to submit a list

13  of training needs in order to meet his performance improvement plan.  (PIP at 1-2.)  On

14  the only occasion in which Mr. Golafale asked, Mr. Henriot immediately granted his

15  request to alter his work schedule for the week.  (3/28/15 Emails at 2.)  Indeed, the last

16  episode in Mr. Golafale's saga of tardiness and absence occurred during a week in which

17  he made his own schedule.  (*Id.*; 4/1/14 Counseling Note at 1; *cf.* MSJ Resp. at 19

18  ("Swedish could have accommodated Mr. Golafale . . . by allowing him to occasionally

19  clock in to work late.").)

20       Mr. Golafale admits that he made no requests for FMLA leave or accommodation

21  of a disability besides the FMLA leave that he received in December 2013.  (1/21/16

22  Golafale Dep. at 50:25-51:5; *see also* 10/28/15 Golafale Dep. at 185:23-186:1 (indicating

1  that Swedish never denied Mr. Golafale a request for time off to go see his doctor).)  Mr.

2  Golafale nonetheless apparently contends Swedish had a duty beyond the actions the

3  court has already described to ignore Mr. Golafale's unresponsiveness and inquire with

4  his doctor.  (*See* MSJ Resp. at 20 ("Dr. Maria Flores . . . would have supported an

5  accommodation for a flexible start time had Swedish requested such a certification.").)

6  Imposing this duty would expand "beyond reasonableness" the "continuing" obligation to

7  engage in a "good-faith" interactive process.  *Austin*, 2013 WL 230824, at *5 ("It goes

8  beyond *Humphrey*, and beyond reasonableness, to hold an employer to more than

9  granting every accommodation request made."); *see also Humphrey*, 239 F.3d at 1137-38

10  ("[A]n employer fails to engage in the interactive process as a matter of law where it

11  rejects the employee's proposed accommodations by letter and offers no practical

12  alternatives."); *Bedeski v. Boeing Co.*, No. C14-1157RSL, 2015 WL 5675427, at *3

13  (W.D. Wash. Sept. 25, 2015) (granting an employer summary judgment on its

14  employee's WLAD and ADA failure to accommodate claims where the employer

15  provided the employee information on requesting the accommodation and the employee

16  only submitted medical documentation with no accommodation request); *see also Beck v.*

17  *Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) ("[N]either party

18  should be able to cause a breakdown in the process for the purpose of either avoiding or

19  inflicting liability. . . . [C]ourts should look for signs of failure to participate in good faith

20  or failure by one of the parties to make reasonable efforts to help the other party

21  determine what specific accommodations are necessary.").

22

1    The evidence demonstrates that Swedish engaged in continuing good-faith efforts

2  to accommodate Mr. Golafale.  Those efforts were unfruitful because Mr. Golafale was

3  not "interactive" in the process—he received the only accommodation he requested, and

4  his doctor indicated he did not need any further schedule flexibility.  Even viewing the

5  evidence in the light most reasonable to Mr. Golafale, no reasonable factfinder could

6  conclude otherwise.  Accordingly, the court grants Swedish's motion for summary

7  judgment as to Mr. Golafale's claims for failure to accommodate under the ADA and the

8  WLAD.

9                              IV.    CONCLUSION

10    For the foregoing reasons, the court GRANTS Swedish's motion for summary

11  judgment (Dkt. # 18) and DISMISSES this case WITH PREJUDICE.

12    Dated this 5th day of April, 2016.

13

14                                                    _____
                                                      JAMES L. ROBART
15                                                    United States District Judge

16

17

18

19

20

21

22